STATE OF CONNECTICUT *v.* ERIC KELSEY
(AC 26346)

Lavery, C. J., and Dranginis and McLachlan, Js.

Argued December 6, 2005—officially released January 31, 2006

*Avery S. Chapman*, special public defender, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, and *Brian Preleski*, senior assistant state's attorney, for the appellee (state).

*Opinion*

McLACHLAN, J. The defendant, Eric Kelsey, appeals from the judgment of conviction, rendered after a jury trial, of felony murder in violation of General Statutes § 53a-54c and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a)

and 53a-134 (a) (3).[1] On appeal, the defendant claims that the trial court improperly (1) admitted certain out-of-court statements into evidence at trial under the "adoptive admissions" exception to the hearsay rule and (2) denied his motion for a mistrial on the basis of the state's failure to produce exculpatory or potentially exculpatory evidence. We disagree and affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On August 15, 2001, the victim, Omar Celik, worked at the Miss Washington Diner located on Washington Street in New Britain. The diner was operated by his brother, Guven Celik. The victim lived in an apartment building next to the diner with a roommate, Erol Aydin, who also worked at the diner.

Ashley Chicerchia, fifteen years old at the time, used drugs and paid for them by engaging in prostitution. She knew the victim because he was a regular customer of hers. On the morning of August 15, 2001, during the victim's shift, Chicerchia, Joseph Cupe, Rob Swain and Kevin Taylor had breakfast at the diner. While in the diner, Chicerchia noticed Juan Morales walking by and signaled to him to come into the diner. The victim saw all of them together in the dining area. At some point, the victim told Chicerchia that Aydin wanted to be her customer and to meet him at the apartment at 11 a.m. Shortly after Morales arrived, they all left the diner, and Chicerchia walked to the victim's apartment to have sexual relations with Aydin.

While in the apartment with Aydin, Chicerchia noticed that he had a substantial sum of money in his wallet. At Aydin's request, she planned on returning to the victim's apartment at 9 p.m. Sometime between the first visit and the planned second visit to the victim's

---

[1] The jury found the defendant not guilty of the charge of murder in violation of General Statutes § 53a-54a (a).

apartment, Chicerchia met with the defendant, Morales and Hector Fermaint, and they discussed how the four of them would rob Aydin of his money when Chicerchia returned to the victim's apartment later that evening. The defendant asked Chicerchia how much money was in the apartment. At about 9:20 p.m., they set off for the victim's apartment and arrived approximately ten minutes later. All three males were wearing sweatshirts or sweaters with hoods. After their arrival, Chicerchia gained entrance to the secured building by ringing the buzzer of a woman she knew who lived in that building. Chicerchia often used the woman's apartment to meet her customers and paid the woman with drugs. When Chicerchia was inside the building, she went to a side door and let the defendant, Morales and Fermaint into the building. She then knocked on the sliding glass door of the victim's apartment, and the victim opened the door and let her in. Aydin was not home. Chicerchia asked the victim to leave the door open, saying that it was too warm in the apartment.

After Chicerchia sat on the couch, the defendant, Morales and Fermaint entered the victim's apartment through the open sliding glass door. They all had their hoods up and were wearing masks. The three males physically attacked the victim. The defendant had a knife, approximately seven or eight inches in length. Morales saw the defendant hit the victim on the top of his head with the handle of the knife. The victim was screaming, and Chicerchia saw the defendant stab him in the abdomen. They all ran out of the apartment and went back to the defendant's house. At his house, the defendant wiped blood off the blade of his knife onto his T-shirt. He then took off the T-shirt and put it into a plastic bag.

The victim was taken to a hospital. His brother arrived shortly before the victim was taken into surgery and asked what had happened. The victim responded

that he had been sleeping when two or three people attacked him. He indicated that their faces were covered, but that they ate meals at the diner. The victim's brother testified that the victim told him that "[t]hey had the morning meal and they left." The victim died during the surgical procedure. The cause of death was a stab wound to the chest and abdomen with injuries to internal organs.

Chicerchia was questioned by the police and arrested on August 16, 2001. That same day, Morales met with the defendant and Fermaint at Edwin Otero's house. Morales, in the presence of the defendant, told Otero that "they did something crazy." The defendant and Morales said they went into a studio to rob someone and that the door was open. The defendant said that the victim tried to scream, so he stabbed him. At Otero's house, the defendant took an army type knife in a leather holder and wrapped it in a newspaper. He then put the knife in the microwave oven.

Morales turned himself in to the police. The defendant and Fermaint knew that the police were looking for them. They went to the home of Ivan Matias. In the presence of the defendant, Fermaint told Matias that he, Morales and the defendant went to an apartment to rob a man, that the man started to yell and cry, and that they stabbed him. Fermaint and the defendant asked Matias if he would let them stay at the house. Matias let them stay in the basement for three days. On the second day, the defendant handed Matias a package and indicated that it contained a knife, and the defendant and Fermaint asked Matias to "get rid of it." Matias, without looking inside the package, threw it into the pond where he went fishing.

Michael Baden, a sergeant with the New Britain police department, took part in the investigation of the homicide. In connection with the investigation, he inter-

viewed Cupe sometime in August, 2001, and seized two knives and a piece of stained cardboard in his possession. There was no indication that any of the seized items were involved in the homicide. The knives were kitchen knives, one a steak knife and the other a paring knife with a two inch blade; they were not army type knives. The items were placed in the detective bureau evidence room, but could not be located anytime thereafter.

The defendant was arrested and charged with murder, felony murder and conspiracy to commit robbery in the first degree. The jury found the defendant guilty of felony murder and conspiracy to commit robbery in the first degree. The defendant filed motions for a judgment of acquittal and for a new trial, which were denied by the court.

I

The defendant claims that the court improperly admitted Matias' testimony as to statements made by Fermaint in the presence of the defendant the day after the homicide. Although the court would not admit the statements under the coconspirator exception to the hearsay rule, having concluded that the conspiracy had ended, the court did permit their admission under the adoptive admissions exception to the hearsay rule. The defendant claims that because the statements were not admissible under the coconspirator exception, they should not have been admitted as adoptive admissions because the silence of the defendant was insufficient to attribute Fermaint's statements to him. We disagree.

"[T]he question of whether a third party statement may be used against the defendant as an adoptive admission by silence is an evidentiary issue . . . ." (Citations omitted.) *State* v. *Schiappa*, 248 Conn. 132, 164, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999). "It is axiomatic that [t]he trial

court's ruling on the admissibility of evidence is entitled to great deference. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *Margolin* v. *Kleban & Samor, P.C.*, 275 Conn. 765, 779–80, 882 A.2d 653 (2005).

"Generally, statements made within the accused's hearing, which are relevant and material, to which he makes no reply, may be given in evidence as indicative of conduct on his part, when the circumstances show that he heard, understood and comprehended the statement, and the facts are known to him and he had the opportunity to speak and the circumstances naturally called for a reply from him." (Internal quotation marks omitted.) *State* v. *Morrill*, 197 Conn. 507, 535, 498 A.2d 76 (1985). The statements at issue were those of Fermaint as recounted during the testimony of Matias. Matias testified that in August, 2001, after the homicide, Fermaint and the defendant came to his house. In the presence of the defendant, Fermaint told Matias that Chicerchia had indicated that a man had money and that he, Morales and the defendant went there to rob him; that when they went to the apartment to rob him, the man started crying and yelling, and that they then stabbed him; that Morales turned himself in to the police and Chicerchia was arrested; and that the police were looking for him and the defendant. At that point, Matias indicated that both Fermaint and the defendant had asked Matias if they could stay at his house.

Clearly, the statements were relevant and material to the defendant's involvement in the homicide. If the jury believed Matias, the defendant was part of the three person conversation, even though he did not state that he stabbed the victim. Although he made no reply, he had the opportunity to speak and to contradict Fermaint's statements, and the circumstances naturally

called for a reply from him. From Fermaint's and the defendant's asking Matias to let them stay at his house, it is evident that the defendant heard and understood Fermaint's comments about the incident and the fact that the police were looking for both of them. The circumstances further indicate that the defendant heard and understood Fermaint's statements because the next day they both asked Matias to dispose of a knife. The defendant handed him a package and indicated that it contained a knife.

Even if we had determined that the court improperly admitted the testimony of Matias as to Fermaint's statements, the admission would not have been harmful. "Even when a trial court's evidentiary ruling is deemed to be improper, we must determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful." (Internal quotation marks omitted.) *Madsen* v. *Gates*, 85 Conn. App. 383, 399, 857 A.2d 412, cert. denied, 272 Conn. 902, 863 A.2d 695 (2004). "The standard for determining whether a nonconstitutional error is harmful is whether it is more probable than not that the erroneous action of the court affected the result." (Internal quotation marks omitted.) *State* v. *Meehan*, 260 Conn. 372, 397, 796 A.2d 1191 (2002).

Fermaint's statements, as recounted in the testimony of Matias, were merely cumulative. Immediately prior to Fermaint's testimony, the jury heard the testimony of Otero. His testimony, including a previous written statement he gave to police that was read before the jury, indicated that Morales, Fermaint and the defendant came to his house after the homicide. Morales and Fermaint indicated that they "did something crazy" and that they stabbed a man in the chest. The defendant and Morales stated that they went to an apartment to rob a man, and the defendant indicated that he stabbed

the man when he started to scream. The defendant, when at Otero's house, took an army type knife in a leather holder out of his underwear, wrapped it in a newspaper and put it inside the microwave. Given that testimony, the admission of which has not been challenged on appeal, and the testimony of Chicerchia and Morales, it is not reasonable to conclude that the outcome of the trial would have been any different if the challenged testimony had been excluded.

## II

The defendant next claims that the court improperly denied his motion for a mistrial, which was based on the failure of the police to preserve exculpatory or potentially exculpatory evidence and the state's failure to produce it in response to his motion for discovery. Specifically, the defendant argues that the failure to produce the requested evidence violated his due process rights because (1) the court failed to undertake the requisite analysis under State v. Asherman, 193 Conn. 695, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985), and (2) he was deprived of the opportunity to meaningfully cross-examine witnesses.[2]

---

[2] The defendant made an oral motion for a mistrial on December 11, 2003, after the conclusion of evidence but before the jury returned its verdict, which motion was denied. On December 17, 2003, the defendant filed a postverdict motion for a new trial. The court ruled on the motion on March 2, 2004, prior to sentencing the defendant. It denied the motion and, in doing so, stated that it was incorporating its remarks from its previous denial on December 11, 2003. The court stated: "So, for the first time today, on the third day of jury deliberations, this issue of a mistrial is being raised. Counsel for the accused has conceded during his argument that whatever hearing [with respect to unpreserved evidence that] might have been held has, in fact, been held by way of the testimony of Detective Baden and Detective Lawrence Betterini that the chain of custody, such as it is, or, perhaps, the chain of lack of custody has been established through the testimony of those two officers. Counsel for the accused had ample opportunity to cross-examine both of those gentlemen and did so, and the record, as developed in the course of that examination, is as indicated by the state's attorney, which is that there's no apparent connection between those knives and the knife that's been testified to as the murder weapon. So, counsel did have

"While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during a trial in which his function is to assure a fair and just outcome. . . . The trial court is better positioned than we are to evaluate in the first instance whether a certain occurrence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice. . . . The decision whether to grant a mistrial is within the sound discretion of the trial court. . . . Put another way, [o]n appeal, the defendant bears the burden of establishing

ample opportunity to establish a record, did establish a record, and the record indicates that there's unlikely to have been any connection between those knives and the knife that has been testified to as the murder weapon here.

"So, the absence of those knives, it seems to me, does not establish any substantial and irreparable prejudice to the defendant's case. To the contrary, defense counsel made mention on several occasions during closing argument to the jury of the sloppiness with which the New Britain police department handled those knives and, I think, made effective use of the fact that those knives, although seized contemporaneously with the commission of this crime, were, nevertheless, lost, never tested, never produced. So, rather than their absence being substantially and irreparably prejudicial to the accused, it seems to me that counsel made good use of the absence of those knives and the police department's failure to produce them and or test them.

"So, again, rather than being prejudicial, it seems to me that their absence has actually been helpful to the accused, especially in view of the record which is that they really bear no resemblance to the knife that has been identified or described as the murder weapon.

"So, I can't find that there has either been an error or a legal defect in the proceedings or any conduct inside or outside the courtroom which has resulted in substantial and irreparable prejudice to the defendant's case. Therefore, the motion for a mistrial is denied."

that there was irreparable prejudice to the defendant's case such that it denied him a fair trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Coltherst*, 87 Conn. App. 93, 99, 864 A.2d 869, cert. denied, 273 Conn. 919, 871 A.2d 371 (2005).

The misplaced evidence at issue in this action consisted of two knives and a piece of stained cardboard that Baden took from a storage shed at Cupe's residence during his interview in August, 2001. Chicerchia identified Cupe as one of the men who had breakfast with her at the diner on the morning of the victim's death. The defendant argues that because the victim identified his assailants as the men who had breakfast at the diner that morning and because the victim died from a stab wound, the two knives and the piece of cardboard with a "blood-like" stain recovered from Cupe was exculpatory or potentially exculpatory evidence.

With respect to the claim that the unpreserved evidence was exculpatory, "[i]n *Brady* v. *Maryland*, [373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)], the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. To establish a *Brady* violation, the defendant must show that (1) the government suppressed evidence, (2) the suppressed evidence was favorable to the defendant, and (3) it was material [either to guilt or to punishment]. . . . The United States Supreme Court . . . in *United States* v. *Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), [held] that undisclosed exculpatory evidence is material, and that constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability suffi-

cient to undermine confidence in the outcome." (Citation omitted; internal quotation marks omitted.) *State* v. *Ross*, 269 Conn. 213, 304, 849 A.2d 648 (2004).

The defendant did not demonstrate that the state failed to disclose exculpatory evidence. "Exculpatory has been defined to mean [c]learing or tending to clear from alleged fault or guilt; excusing." (Internal quotation marks omitted.) *State* v. *Falcon*, 90 Conn. App. 111, 121, 876 A.2d 547, cert. denied, 275 Conn. 926, 883 A.2d 1248 (2005). There was no indication that any of the items seized from Cupe were involved in the homicide. The knives were kitchen knives, one a steak knife and the other a paring knife with a two inch blade; they were not army type knives. The murder weapon was described as an army type knife, approximately seven to eight inches in length. Further, Chicerchia testified that Cupe was not involved at all in the planning of the robbery or the homicide. The fact that the victim stated that his assailants had eaten breakfast at the diner that morning is insufficient to warrant a different conclusion, given the absence of any other evidence to show that Cupe stabbed the victim or that the knives and cardboard were in any way connected to the homicide. It should be noted that the victim stated that his assailants wore masks, so identification would be problematic. Moreover, one of the participants in the attempted robbery, Morales, *was* at the diner that morning. Unfortunately, the victim made only a few statements before being taken to surgery and was unable to provide any additional information.[3]

With respect to the defendant's claim that the unpreserved evidence was potentially exculpatory, it is true that the good faith or bad faith of the police in failing

---

[3] Even if the unpreserved evidence was exculpatory, it was not material because, for the reasons previously stated, the results of the trial would not have been different had it been produced and admitted.

to preserve potentially useful evidence cannot be dispositive of whether a criminal defendant has been deprived of due process of law. *State* v. *Morales*, 232 Conn. 707, 726, 657 A.2d 585 (1995). In the present case, there is no claim that the police or the state intentionally disposed of the knives and cardboard; the defendant does not allege bad faith in connection with the loss of those items. When evidence is lost that is potentially exculpatory, courts engage in a balancing test as set forth in *State* v. *Asherman*, supra, 193 Conn. 724, to determine whether the defendant has been afforded due process of law under the state constitution. See *State* v. *Morales*, supra, 720. "[T]he trial court must balance the totality of the circumstances surrounding the missing evidence, including the following factors: the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to the defendant caused by the unavailability of the evidence." (Internal quotation marks omitted.) Id., 727.

The defendant claims that the court failed to undertake the requisite analysis under *Asherman*. That claim is without merit. As previously noted in footnote 2, the court incorporated its remarks from the denial of the defendant's oral motion for a mistrial on December 11, 2003, as its reasons for the denial of the defendant's postverdict motion for a new trial on March 2, 2004. The court, in considerable detail, gave its reasons for concluding that the misplaced knives were not material to the homicide, that there had been considerable testimony as to the circumstances surrounding their seizure and loss, and that there had been no prejudice to the defendant, given the totality of the evidence presented at trial. In fact, the court found that defense counsel had conceded that no further evidence needed to be presented in order to rule on the motion for a mistrial

on the basis of the unavailability of the two knives and cardboard and that, in fact, the absence of those items may have been helpful to the defendant's case. The court properly applied the balancing test set forth in *Asherman.*

The defendant also claims that the unavailability of the unpreserved evidence precluded him from meaningful cross-examination of witnesses. "It is axiomatic that the defendant is entitled fairly and fully to confront and to cross-examine the witnesses against him. . . . The test is whether the opportunity to cross-examine existed, not whether full use of such opportunity was made. . . . In order to comport with the constitutional standards embodied in the confrontation clause, the trial court must allow a defendant to expose to the jury *facts from which the jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.* . . . In determining whether a defendant's right of cross-examination has been unduly restricted, we consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Citations omitted; internal quotation marks omitted.) *State v. Swinton,* 268 Conn. 781, 832–33, 847 A.2d 921 (2004).

The defendant argues that he could not meaningfully cross-examine Cupe and the state's witnesses about the missing knives. He contends that if the knives had been available and could have been tested, he could have established that Cupe was involved in the planning of the robbery and had stabbed the victim. That argument is pure speculation. Other than being one of several people at the diner on the morning of the homicide, no testimony or other evidence was presented to connect Cupe with those crimes. The missing knives, as noted by the court, did not match the description given of the

murder weapon. The defendant questioned Baden and Detective Lawrence Betterini at length about the items, as to when they were seized, from whom they were taken and the failure of the police department to locate them for the trial. The court did not restrict the defendant's cross-examination of any of the state's witnesses with respect to the issue of the unpreserved evidence. Furthermore, the jury heard substantial evidence about the knife that was disposed of by Matias.

The defendant is claiming, in reality, that the absence of the knives and the cardboard warrants a mistrial regardless of the latitude he was given in cross-examining witnesses and arguing police incompetence in the investigation in his closing argument to the jury. A trial court is not required to take such a drastic action, even if the state's failure to preserve evidence has adversely affected the defendant's right to a fair trial. "Rather, the trial court may fashion another remedy that appropriately ameliorates or offsets the prejudice that the defendant has suffered as a result of the unavailability of the evidence." *State* v. *Morales*, supra, 232 Conn. 729. In this case, the court ameliorated any potential prejudice to the defendant by allowing unfettered cross-examination of the state's witnesses regarding the loss of the evidence and in allowing his closing argument to focus on the state's failure to produce the requested items that were seized from Cupe. We conclude that the court's denial of the defendant's motion for a mistrial reflected a sound exercise of its discretion.

The judgment is affirmed.

In this opinion the other judges concurred.