STATE OF CONNECTICUT *v.* JAMES GLENN
(AC 25794)

DiPentima, McLachlan and McDonald, Js.

Argued March 28—officially released October 3, 2006

*James B. Streeto,* assistant public defender, for the appellant (defendant).

*Frederick W. Fawcett,* supervisory assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict,* state's attorney, and *Cornelius P. Kelly,* senior assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, J. The defendant, James Glenn, appeals from the judgment of conviction, rendered after a jury trial, of one count of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1)[1] and one count of risk of injury to a child in violation of General Statutes (Rev. to 2001) § 53-21 (a) (2).[2] On appeal, the defendant claims that (1) the trial court denied him his constitutional rights to confront witnesses and to present a defense by precluding evidence of the victim's prior sexual conduct, (2) he was denied due process of law as a result of prosecutorial misconduct and (3) the court improperly charged the jury on consciousness of guilt.[3] We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On Saturday, September 28, 2002, the defendant, aged eighteen years, went to the Bridgeport home of the victim, a mentally challenged fifteen year old girl.[4]

---

[1] General Statutes § 53a-71 (a) provides in relevant part: "A person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and: (1) Such other person is thirteen years of age or older but under sixteen years of age and the actor is more than two years older than such person . . . . "

[2] General Statutes (Rev. to 2001) § 53-21 (a) provides in relevant part: "Any person who . . . (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of a class C felony."

[3] The defendant also claims that his conviction for both sexual assault in the second degree and risk of injury to a minor constitutes double jeopardy. The defendant's claim is controlled by our decisions in *State* v. *Bletsch*, 86 Conn. App. 186, 860 A.2d 299 (2004), cert. granted, 272 Conn. 918, 866 A.2d 1288 (2005), and *State* v. *Ellison*, 79 Conn. App. 591, 830 A.2d 812, cert. denied, 267 Conn. 901, 838 A.2d 211 (2003), in which we concluded that conviction under both General Statutes §§ 53a-71 and 53-21 for the same incident does not constitute multiple punishments for the same offense.

[4] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

At the time, the victim was home alone with her younger brother, M, who also was mentally challenged, and her younger sister, S.[5] The defendant, who lived on the same street as the victim, knocked on the front door, and M admitted him into the house.

Upon entering, the defendant immediately went to the second floor bedroom where the victim was and closed the door. The defendant then placed a small dresser in front of the door and ordered the victim to undress. After the victim undressed, the defendant, himself, disrobed and told the victim to get on the bed. When the victim refused, he pushed her onto the bed and began to have intercourse with her. The victim asked the defendant what he was doing and attempted to get him off of her but was unsuccessful due to his superior strength. The defendant continued, despite the victim's requests that he stop, until she began to bleed. At that time, the defendant stopped, wiped himself off with a towel and left the house.

After the defendant left, the victim was unsure of what to do. By chance, her close friend, C, called, and the victim told her what had happened. C immediately went to the victim's house, where she found the victim hysterical and covered in blood. C's sister called the police and an ambulance. Before being transported to a hospital, the victim gave a statement to the responding police officer.

The victim was taken to St. Vincent's Hospital in Bridgeport. She first was treated by Marsha Zellner, the physician who conducted the initial emergency room examination, and collected information and samples pursuant to the standard sexual assault protocols. Zellner's examination revealed a laceration that began at the posterior part of the vagina and extended toward the rectum, an area described as the forchette. The victim's

---

[5] M and S were nine and six years old, respectively, at the time of trial.

high level of anxiety and unfamiliarity with gynecological examinations, however, prevented Zellner from completing the examination. Zellner enlisted Pierre Hage, a gynecologist, to repair the injury to the forchette and to complete the examination while the victim was under anesthesia.[6] During his examination, Hage discovered two additional lacerations on the victim's hymen. All three lacerations were actively bleeding and required suturing.

After interviewing the victim, Bridgeport police officers went to the house in which the defendant and his mother lived. After obtaining the mother's consent, the officers searched the house but were unable to find the defendant. The officers informed the defendant's mother that they wanted to question the defendant and asked her to relay that information to the defendant if she saw or heard from him. The officers repeatedly returned to the house in an effort to locate the defendant but were unsuccessful. A warrant was issued for his arrest. On March 10, 2003, Stamford police officers apprehended an individual who identified himself as James Slaughter. The officers subsequently discovered that that individual's name was actually James Glenn and that there was an outstanding warrant for his arrest.

I

The defendant's first claim on appeal is that the court improperly denied him his constitutional rights to confront witnesses and to present a defense. We are not persuaded.

The following additional facts are pertinent to the defendant's claim. At the hospital, Zellner and Hage administered a rape kit and completed an emergency room medical report. In that report, Zellner noted that

---

[6] Both Zellner and Hage testified that the injury to the forchette was consistent with a forced sexual encounter.

the "[victim] admits to being with another boy . . . doesn't describe." The state privately questioned the victim regarding Zellner's notation and relayed to the court and defense counsel that it related to an encounter that she had had with a boy when she was thirteen years old. The state represented that "[i]nitially, she said kissing . . . but then she said there was some touching her down there, but she didn't—said nothing to the extent as to what occurred on this particular occasion."

At trial, Zellner and Hage testified for the state. On direct examination, Zellner testified that the vaginal examination she conducted on the victim revealed that the victim's "hymen was torn and bleeding" and that the significance of a torn hymen was "first time inter-course."[7] Defense counsel did not object to Zellner's testimony but rather endeavored on cross-examination to question Zellner about the victim's prior sexual history as described in the medical report. The court sustained the state's objection but indicated that when the jury was released for lunch, defense counsel would be permitted to elaborate his position on the record.

Hage was called to the witness stand after Zellner. He testified, on direct examination, that his examination of the victim revealed that the hymenal area was torn and bleeding and that such injury "was consistent with somebody who is not sexually active and had an injury to the hymen, which, in my opinion, would be for the first time." Defense counsel did not object. Subsequently, Hage was asked by the state: "[I]f one were to engage in sexual intercourse for the first time and the hymen were to bleed, would that necessarily mean that the hymen needed to be sutured?" Although Hage

---

[7] On redirect, Zellner clarified that she did not actually see the victim's hymen.

answered the question over defense counsel's objection, the state withdrew the question and the court struck Hage's answer.

Following the testimony of both physicians and outside the presence of the jury, defense counsel asked the court's permission to admit the emergency room report into evidence by recalling either Zellner or the victim. Defense counsel maintained that the physicians' testimony as well as the state's question, which was couched in terms of first time intercourse, left the jury with a distinct impression that the victim was a virgin prior to the defendant's assault. Defense counsel argued that the defendant should have been afforded the opportunity to counter that impression by putting on evidence that "perhaps another party had caused the tear in the hymen." The court denied the defendant's motion for a mistrial.

On appeal, the defendant argues that the court improperly precluded, under the rape shield statute, General Statutes § 54-86f,[8] the introduction of evidence of prior sexual conduct by the victim. The defendant

---

[8] General Statutes § 54-86f provides in relevant part: "In any prosecution for sexual assault under sections 53a-70, 53a-70a, and 53a-71 to 53a-73a, inclusive, no evidence of the sexual conduct of the victim may be admissible unless such evidence is (1) offered by the defendant on the issue of whether the defendant was, with respect to the victim, the source of semen, disease, pregnancy or injury, or (2) offered by the defendant on the issue of credibility of the victim, provided the victim has testified on direct examination as to his or her sexual conduct, or (3) any evidence of sexual conduct with the defendant offered by the defendant on the issue of consent by the victim, when consent is raised as a defense by the defendant, or (4) otherwise so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights. Such evidence shall be admissible only after a hearing on a motion to offer such evidence containing an offer of proof. On motion of either party the court may order such hearing held in camera, subject to the provisions of section 51-164x. If the proceeding is a trial with a jury, such hearing shall be held in the absence of the jury. If, after hearing, the court finds that the evidence meets the requirements of this section and that the probative value of the evidence outweighs its prejudicial effect on the victim, the court may grant the motion. . . ."

argues that the proffered evidence was admissible because (1) the state opened the door by eliciting testimony from the physicians that the significance of a hymenal tear was first time sexual intercourse and (2) the proffered evidence fell within two of the statutory exceptions to the rape shield statute, as it was (a) offered "on the issue of whether the defendant was . . . the source of . . . [the] injury" and (b) "so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights. . . ." General Statutes § 54-86f (1) and (4).

The state argues that, rather than falling under the auspices of the rape shield statute, the proffered evidence was properly precluded by the court under the general rules of relevancy. We agree with the state.[9]

"It is axiomatic that [a criminal] defendant is entitled fairly and fully to confront and to cross-examine the witnesses against him." (Internal quotation marks omitted.) *State* v. *Kelsey*, 93 Conn. App. 408, 421, 889 A.2d 855, cert. denied, 277 Conn. 928, 895 A.2d 800 (2006). "The confrontation clause does not, however, suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited through cross-examination." (Internal quotation marks omitted.) *State* v. *Irizarry*, 95 Conn. App. 224, 244, 896 A.2d 828, cert. denied, 279 Conn. 902, 901 A.2d 1224 (2006).

Evidence is relevant if it has "any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." Conn. Code Evid. § 4-1. "There is no exact or universal test of relevancy. Rather, each such determination must be guided

---

[9] We note that the record reveals that the defendant did not expressly ask the court to rule on the admissibility of the proffered evidence under General Statutes § 54-86f.

by sound legal reasoning and judicial experience. . . . A fact is relevant to another if in the normal course of events its existence, alone or in conjunction with other facts, makes the existence of the other fact more likely or more certain. . . . The probative value of evidence is merely its tendency to persuade the trier of fact on a given issue." (Citations omitted.) *State* v. *Brown*, 9 Conn. App. 313, 316–17, 518 A.2d 670 (1986), cert. denied, 202 Conn. 804, 520 A.2d 1037 (1987). "The proffering party bears the burden of establishing the relevance of the offered testimony. Unless such a proper foundation is established, the evidence . . . is irrelevant." (Internal quotation marks omitted.) *State* v. *Gregory C.*, 94 Conn. App. 759, 765, 893 A.2d 912 (2006). "The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Irizarry*, supra, 95 Conn. App. 244.

At trial, one of the defenses offered by the defendant was that he did not engage in sexual activity with the victim. In offering Zellner's statement that the victim had admitted to "being with" another boy, the defendant sought to further this defense by establishing that the injury to the victim's hymen could have been the result of prior sexual intercourse. The defendant, however, failed to establish a basis for the inference that the victim actually had engaged in sexual intercourse on a prior occasion.

The defendant did not question the victim outside the presence of the jury with respect to what she meant in her statement to Zellner that she had "[been] with" another boy. As a result, the only evidence before the court as to what she meant was the state's representation that the victim had indicated that the statement

related to an encounter, two years prior, that involved kissing and perhaps fondling. Moreover, both physicians testified that the lacerations in the victim's hymen were actively bleeding at the time they examined her. The defendant never questioned either physician as to that fact or as to whether it was possible that the injuries to the hymen could have been caused at a previous time.

We conclude, therefore, that the court did not abuse its discretion in precluding the proffered evidence. The admission of the statement would only have injected speculation and conjecture into the jury's deliberations by having the jury guess as to what the victim meant. Because we conclude that the proffered evidence was irrelevant, we need not decide whether such evidence, if relevant, would be admissible under the rape shield statute.

## II

We next address the defendant's claim that he was denied due process of the law as a result of prosecutorial misconduct. Specifically, the defendant claims that the prosecutor engaged in misconduct by (1) appealing to the emotions and passions of the jury, (2) commenting on the veracity of witness testimony and (3) misrepresenting the physical evidence. We are not persuaded by any of these claims.

The defendant did not object to the instances of claimed prosecutorial misconduct at trial and seeks review of his unpreserved claims pursuant to *State* v. *Stevenson*, 269 Conn. 563, 849 A.2d 626 (2004).[10] "[I]n

[10] "[I]n cases . . . [involving incidents of prosecutorial misconduct that were not objected to at trial], it is unnecessary for the defendant to seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test. The reason for this is that the touchstone for appellate review of claims of prosecutorial misconduct is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). . . ."

analyzing claims of prosecutorial misconduct, we engage in a two step analytical process. The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial." (Internal quotation marks omitted.) Id., 572. "Put differently, misconduct is misconduct, regardless of its ultimate effect on the fairness of the trial; whether that misconduct caused or contributed to a due process violation is a separate and distinct question . . . . [O]ur determination of whether any improper conduct by the state's attorney violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)] . . . ." (Internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 361–62, 897 A.2d 569 (2006). "The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial [by virtue of prosecutorial misconduct] we must view the prosecutor's comments in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Stevenson*, supra, 571.

A

The defendant claims that during closing arguments, the prosecutor improperly appealed to the emotions and passions of the jury. Specifically, the defendant maintains that the prosecutor improperly wove a theory of vulnerability into the state's case and then embarked on a personal attack of the defendant. We are not persuaded.[11]

"The application of the *Williams* factors . . . is identical to the third and fourth prongs of *Golding* . . . . Requiring the application of both *Williams* and *Golding*, therefore, would lead . . . to confusion and duplication of effort." (Citation omitted.) *State* v. *Stevenson*, supra, 269 Conn. 572–74.

[11] The defendant also claims that the state improperly sought to elicit sympathy for the victim by summarizing the testimony of the victim in an inflammatory manner. The defendant objects to what he calls the state's

It is well settled that "[a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 376. "Therefore, a prosecutor may argue the state's case forcefully, [but] such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 719, 793 A.2d 226 (2002).

We begin by setting forth certain additional facts. The state began its closing argument with the following statement: "The cornerstone of this case, ladies and gentlemen, is one about vulnerability; that [the victim] is the kind of child most people would turn away from and was taken advantage of precisely because she is the type of person that others may not believe." The state then proceeded to introduce the key witnesses to the assault, the victim, M and S. In describing the victim and M, the state, on a number of occasions, referred to their intellectual limitations.

The defendant contends that by dwelling on the victim's vulnerability and on the witnesses' disabilities, the state improperly attempted to arouse the jury's emotions and invoke sympathy and pity for the victim.[12] We disagree.

"lurid" depiction of the victim's assault. The defendant concedes that the victim's testimony supported this description but argues that the state's repetition of it spurred the jury's already inflamed emotions. Because we conclude that the prosecutor did not improperly inflame the jury's emotions in any other way, we conclude that the state's repetition of the victim's testimony was not an improper appeal to the jury's emotions.

[12] In addition, the defendant argues that it was improper for the state, during the evidentiary portion of the trial, to elicit testimony that might lead the jury to conclude that the victim was a virgin prior to the sexual assault. The defendant contends that this evidence was not necessary to establish

The evidence adduced at trial established that the victim was fifteen years old, mentally disabled, shy and often the recipient of her classmates' taunts. It is well established that "as the state's advocate, a prosecutor may comment on the evidence adduced at trial and argue inferences that the jurors might draw therefrom." *State* v. *Sargent*, 87 Conn. App. 24, 34, 864 A.2d 20, cert. denied, 273 Conn. 912, 870 A.2d 1082 (2005). Moreover, "not every use of rhetorical language or device is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 366. In the present case, the prosecutor's remark that the victim was vulnerable amounted to a reasonable inference from the testimony adduced at trial. Accordingly, we conclude that the state's remark did not constitute misconduct.

We also conclude that the state's references to the mental disabilities of the victim and M did not constitute misconduct. The state referenced their disabilities on five separate occasions. In each instance, however, the state merely urged the jury to consider the witnesses' disabilities, which were established clearly in the evidence, when assessing their credibility and demeanor. Cf. *State* v. *Thompson*, 266 Conn. 440, 466, 832 A.2d 626 (2003) (it is not improper for a prosecutor to remark

the charges against him and was introduced merely to arouse the jury's sympathy.

The state asked Zellner: "What is the significance of a torn hymen?" The state asked Hage: "[W]hat significance, if any, [were] your findings with respect to [the victim] in the injuries . . . that you saw to the hymen versus the history that she gave you as to what occurred?" Both physicians answered that the injury was consistent with first time intercourse. We conclude that the state's questions regarding the victim's injuries were not improper, as they were designed to elicit relevant testimony, such as whether the injury was consistent with forced intercourse, and not merely to excite the passions, awaken the sympathy or influence the judgment of the jury. We note that the defendant did not object to the physicians' answers at the time that they were given or at any point thereafter.

on the motives that a witness may have to lie or not to lie). We thus conclude that the state's remarks in this regard were not an attempt to arouse the jury's sympathy and consequently did not constitute misconduct.

With respect to the second claim of impropriety, the defendant contends that after having created an atmosphere of sympathy for the victim, the state embarked on a personal attack on the defendant by sarcastically labeling him "[a] loving son, a son who cared for his mom," in order to create an atmosphere of dislike for the defendant. We disagree that the state's comments were improper.[13]

"[O]ur Supreme Court has recognized that repetitive and excessive use of sarcasm is one method of improperly swaying the fact finder." *State* v. *John M.*, 87 Conn. App. 301, 314, 865 A.2d 450, cert. granted on other grounds, 273 Conn. 916, 871 A.2d 372 (2005). The use of sarcasm only once or twice does not, however, constitute such an appeal. Id.

In this case, the defendant's mother was asked at trial about her son's absence following the victim's assault. During that line of questioning, she testified that the defendant left town on the day of the victim's assault. She testified further that she considered the defendant a

---

[13] During closing arguments, the prosecutor argued: "[T]his defendant, for whatever reason, who saw fit, lo and behold, after this incident, to fall off the face of the earth for a six month period of time? And the court will tell you what you can do with that information concerning the fact that the defendant wasn't around for that period of time. A loving son, a son who cared for his mom, the defendant, who liked his mom, the defendant, who was concerned, and the mom said that on the number of occasions, I got sick. You have the month of September. You have the month of October. You have the holidays in November, on Thanksgiving. You have the holidays in December. You have a new year. You have February. You have March until the time that the Stamford police had contact with the defendant. Not once, if you heard Mrs. Glenn testify, did she have any personal contact with this loving, thoughtful son of hers during a period of time when she was sick."

caring and considerate son and that, during his absence, she was very ill and that she did not see him again until his arrest. When read in context, the state was, in essence, asking the jury to draw the inference that the defendant, described as a caring son by his mother, would not have remained absent had he not been avoiding arrest for the victim's assault. Thus, this argument was not improper because it was based on reasonable inferences drawn from the evidence, and the state's use of sarcasm was limited.[14] See, e.g., id., 314–15.

## B

The defendant's next claim of misconduct stems from the state's closing argument in which the prosecutor questioned the ability of the victim and her siblings to frame the defendant through a conspiracy of lies.

The following additional facts are relevant to our analysis. The defendant offered two defenses at trial: that he was not the victim's assailant or, in the alternative, that any sexual activity that occurred between him and the victim was consensual. Because none of the physical evidence implicated the defendant, the credibility of the witnesses was critical. During the state's case-in-chief, the victim as well as her siblings, M and S, testified as to what transpired on September 28, 2002. The testimony of M and S corroborated the victim's

---

[14] The defendant also raises a separate claim that it was misconduct for the state to argue that the defendant's move to Stamford, following the assault, constituted consciousness of guilt. Nothing in the record indicates that the court directed the parties that the defendant's flight following the assault could not be considered as evidence of consciousness of guilt. The court merely informed the parties that it would instruct, and in fact did instruct, the jury that "[t]he conduct of the defendant in *avoiding surrender* to law enforcement officials may be considered in determining his guilt since it tends to prove a consciousness of guilt." (Emphasis added.) Given the broad nature of this instruction, we conclude that it was not improper for the state to argue that the defendant's flight constituted consciousness of guilt.

account of the assault.[15] Evidence was also presented regarding the limited mental capabilities of the witnesses.[16]

During closing arguments, the state argued: "Do you think that [the victim, M and S] are sophisticated enough, are perhaps intelligent enough—and I don't mean to demean them—sophisticated enough to carry this on from September 28 up until the present time? Where they said people came over to their house, they had said that they passed information on about what they knew; are they sophisticated enough to carry this lie, this conspiracy of lies, to fool the court, to fool the court reporter, to fool each and every one of you? What motive would they have to make this up? The emotions that you saw in this courtroom, were they genuine? Again, I leave those to you."

The defendant maintains that the state's argument stated, in effect, that in order to find him not guilty, the jury had to find that the witnesses acted deliberately to frame him and, therefore, that the argument was improper under State v. Singh, supra, 259 Conn. 693. We disagree.

In Singh, our Supreme Court held that "closing arguments providing, in essence, that in order to find the defendant not guilty, the jury must find that witnesses had lied, are . . . improper." Id., 712. The state may, however, "argue that its witnesses testified credibly, if such an argument is based on reasonable inferences

---

[15] Both M and S testified that the defendant came to the house, went upstairs and entered the bedroom where the victim was and that shortly after, they heard the victim screaming and crying from within. Each also testified that after the defendant left, the victim came downstairs crying.

[16] The victim's older sister, F, testified that the victim and M were enrolled in special education classes. Zellner testified that the victim was a "special needs girl" and that she had to be questioned at the level of a four to five year old because she was incapable of answering the questions posed to her. S testified that she was six years old at the time of the 2004 trial.

drawn from the evidence. . . . Specifically, the state may argue that a witness has no motive to lie. . . . In addition, jurors, in deciding cases, are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion. . . . Therefore, it is entirely proper for counsel to appeal to a jury's common sense in closing remarks." (Citations omitted; internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 365.

Recently, in *State* v. *Warholic*, supra, 278 Conn. 354, our Supreme Court held that it was not improper for the state to argue that it would be a "stretch to think that [the victim] is kind of a—a mastermind behind making this up . . . ." (Internal quotation marks omitted.) Id., 366. The court reasoned that "[w]hen read in context, the essence of the state's argument was that the consistency between [the victim's] actions and [the psychologist's] testimony about the common behavior patterns of sexually abused children supported [the victim's] credibility. Thus, this argument was proper because it was based on reasonable inferences drawn from the evidence. Although the prosecutor's comment that [the victim] would have been a mastermind bordered on hyperbole, we have previously stated that not every use of rhetorical language or device is improper." (Internal quotation marks omitted.) Id.

In the present case, the state did not argue, as the defendant contends, that in order to find him not guilty, the jury had to find that the witnesses lied. Rather, the state suggested that the witnesses did not have the motive or mental capacity to construct a conspiracy of lies. The state's argument, therefore, was no less proper than the argument in *Warholic*. The prosecutor simply asked the jury to consider whether the victim and her siblings were sophisticated enough to perpetrate a conspiracy of lies and also whether they had any motive

to so conspire. In doing so, the state relied on the evidence in the record regarding the witnesses' mental limitations and appealed to the jury's common sense. We conclude, therefore, that the state's argument was not misconduct.

C

The defendant's final claim of prosecutorial misconduct is based on the state's alleged misrepresentation of physical evidence. This claim borders on frivolous.

The first alleged misrepresentation relates to DNA testing performed on a pair of sweatpants seized from the defendant's home. At trial, the victim, M and S all identified the sweatpants as those worn by the defendant on the day of the assault. Joy Reho, a criminalist in forensic biology, testified that there was a small bloodstain on the back right pocket of the sweatpants. Nicholas Yang, a DNA specialist, testified that the defendant was a contributor to the stain and that the victim was excluded as a contributor.

The defendant claims that the state improperly argued that the bloodstain on the defendant's sweatpants confirmed the assault. We find that the record clearly indicates that the state argued only that the bloodstain on the sweatpants confirmed that they belonged to the defendant, not that the blood was independent evidence of the defendant's connection to the crime. In so arguing, the state relied on the facts in evidence.

The second alleged misrepresentation by the prosecutor relates to the DNA found under the victim's fingernails. Yang testified that a DNA sample taken from under the victim's fingernails contained a mixture of DNA from her and possibly another unidentified person. Yang testified further that the defendant could not be the other contributor. During his closing, the defendant

argued: "No physical evidence. No forensic evidence. You heard the lab people. Even the fingernail scrapings, which are a combination of [the victim's] blood and someone else, but not [the defendant]. So, what does that tell us? If anything, it tells us that there was someone other than [the defendant]. What other reason would there be for a mixture of DNA?"

In rebuttal, the state remarked: "Also, some questions were asked of Dr. Yang about scratching and everything. Isn't it quite a coincidence that [defense counsel] didn't ask [the victim] whether or not she scratched the defendant at all during this incident . . . ? There [were] no questions asked of [the victim] whether that [had] happened. So, throwing that out there in a vacuum doesn't help you in resolving the issues here because you don't have any evidence to suggest that, yes, indeed, [the victim] did scratch the person, and it was never asked by me, nor was it ever asked by the defendant, to back up the findings by Dr. Yang. So, something is presented to you, but you don't have anything over here to hook it up. It is something he tosses out there as a red herring,[17] hoping you are going to cling on—on it and discount everything else that was said by the witnesses here."

The defendant claims that the state argued that Yang did not testify that the fingernail scrapings contained a mixture of DNA from the victim and another person. The record indicates that the state made no such argument. The state merely called into question whether

---

[17] At the conclusion of his discussion in his brief regarding the state's alleged misrepresentations, the defendant fleetingly claims that the state's reference to his argument regarding the DNA evidence as a "red herring" constituted misconduct. The defendant then claims that it was also misconduct for the state, in its rebuttal, to accuse defense counsel of conducting an attack on the victim during closing argument. The defendant provides no legal authority or analysis in support of either claim. Accordingly, we decline to review these claims. See *Knapp* v. *Knapp*, 270 Conn. 815, 823 n.8, 856 A.2d 358 (2004) ("[w]here the parties cite no law and provide no analysis of their claims, we do not review such claims" [internal quotation marks omitted]).

the victim ever had claimed to have scratched the defendant. Considering that the defendant's argument asked the jury to infer that the DNA evidence established that the assault was committed by somebody other than the defendant, it was proper for the state to question that inference in its rebuttal.

As already noted, the test for prosecutorial misconduct involves two prongs: "(1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial." (Internal quotation marks omitted.) *State* v. *Stevenson,* supra, 269 Conn. 572. As we have determined that there was no misconduct, we need not reach the second prong.

## III

The defendant's final claim is that the court improperly charged the jury on consciousness of guilt. We disagree.

The court provided the jury with the following instruction. "In a criminal trial, it is permissible for the state to show that conduct of the defendant after the time of the alleged offense may fairly—may fairly have been influenced by the criminal act and, that is, the conduct shows a consciousness of guilt. The conduct of the defendant in *avoiding surrender* to law enforcement officials may be considered in determining his guilt, since it tends to prove a consciousness of guilt.

"However, this conduct, if shown, is not conclusive. The defendant's conduct, if shown, does not raise a legal presumption of guilt, but it is to be given the weight to which the jury thinks it is entitled under the circumstances shown. It is up to you as judges of the facts to decide whether conduct of the defendant reflects consciousness of guilt, and consider such in

your deliberations in conformity with these instructions." (Emphasis added.)

"When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *Jacobs* v. *General Electric Co.*, 275 Conn. 395, 400, 880 A.2d 151 (2005).

To prevail on his claim that the court improperly charged the jury on consciousness of guilt, the defendant must prove that the court abused its discretion. *State* v. *Scott*, 270 Conn. 92, 104, 851 A.2d 291 (2004) ("[T]he decision whether to give an instruction on [consciousness of guilt], as well as the content of such an instruction, if given, should be left to the sound discretion of the trial court. . . . We review the defendant's claim under this standard."), cert. denied, 544 U.S. 987, 125 S. Ct. 1861, 161 L. Ed. 2d 746 (2005).

The defendant's argument is multifaceted. First, the defendant contends that the instruction was improper because the record was devoid of evidence that he was aware of the warrant for his arrest. The defendant argues that in the absence of such evidence, there was no factual predicate on which the jury could conclude that he was avoiding surrender to law enforcement officials. We disagree.

The defendant's reading of the court's instruction and of the record is overly narrow. The defendant's mother testified that the defendant left for Stamford the day of the assault. She testified further that she had spoken to the defendant on a number of occasions following his departure and that, during those conversations, she had informed him that the police were looking for him and wanted to question him. Robert Winkler, a detective with the Bridgeport police department, testified that he told the defendant's mother that a warrant had been issued for her son's arrest. Robert Martin, another detective with the Bridgeport police department, testified that he had placed the defendant's photograph in the Connecticut Post newspaper as a wanted person. Officer James Comstock, of the Stamford police department, testified that when confronted by him and other members of the Stamford police department, the defendant had used a false name. From this evidence, the jury reasonably could have inferred that the defendant knew a warrant had been issued for his arrest. The jury also reasonably could have found that the defendant was "avoiding surrender" by fleeing to Stamford immediately following the assault, remaining there with the knowledge that the police were looking for him in Bridgeport and had issued a warrant for his arrest, and giving the Stamford police a false name upon apprehension.

Second, the defendant argues that the instruction was improper because it omitted the possibility that a variety of innocent motivations might have prompted his actions, such as limited mental capabilities or a desire not to be hassled by the police. This argument is without merit. In *State* v. *Figueroa*, 257 Conn. 192, 777 A.2d 587 (2001), our Supreme Court made clear that "[t]he fact that the evidence might support an innocent explanation as well as an inference of a consciousness of guilt does not make an instruction on [consciousness

of guilt] erroneous. . . . [T]he court [is] not required to enumerate all the possible innocent explanations offered by the defendant." (Internal quotation marks omitted.) Id., 197; see also *State* v. *Martin*, 77 Conn. App. 778, 804–805, 825 A.2d 835 (court rejected defendant's argument that court's consciousness of guilt instruction was improper because it did not include language that flight or evasive conduct might be caused by reasons other than guilt of the crime charged), cert. denied, 266 Conn. 906, 832 A.2d 73 (2003).

Finally, the defendant argues that the charge improperly suggested that the inference of consciousness of guilt was "favored by the law," thereby creating a risk that the jury would believe that he bore the burden to rebut that inference. The defendant's argument, however, is not supported by the record. The court's instruction was clear that it was up to the jury as the finder of facts to decide whether to infer consciousness of guilt from the defendant's conduct. The court explicitly stated: "The defendant's conduct, *if shown* . . . is to be given the weight to which the jury thinks it is entitled under the circumstances shown. *It is up to you as judges of the facts to decide whether conduct of the defendant reflects consciousness of guilt* . . . ." (Emphasis added.)

The judgment is affirmed.

In this opinion the other judges concurred.