STATE OF CONNECTICUT *v.* EUGENE CROMETY
(AC 26942)

Schaller, Harper and Lavine, Js.

Argued February 6—officially released July 17, 2007

*Kirstin B. Coffin*, special public defender, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were, *Kevin D. Lawlor*, state's attorney, and *Mary M. Galvin*, former state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Eugene Cromety, appeals from the judgment of conviction, following a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1) and risk of injury to a child in violation of General Statutes § 53-21 (a) (2).[1] On appeal, the defendant claims that (1) prosecutorial impropriety[2] deprived him of the constitutional right to a fair trial and (2) the court abused its discretion by permitting the state to present testimony (a) under the medical treatment exception to the hearsay rule and (b) concerning the victim's credibility. We disagree and therefore affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The victim,[3] who is deaf,[4] was born in 1989. On

[1] The jury found the defendant not guilty of one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2).

[2] Subsequent to oral argument in this court, our Supreme Court rendered its decision in *State* v. *Fauci*, 282 Conn. 23, 917 A.2d 978 (2007), in which it was held that the term "prosecutorial impropriety" is more appropriate than the traditional term "prosecutorial misconduct." Id., 26 n.2. Although the parties briefed and argued the defendant's first claim under the more traditional nomenclature of prosecutorial misconduct, we have adopted the term prosecutorial impropriety in our analysis of the defendant's claim.

[3] In accordance with our policy of protecting the privacy interests of the victims of sexual assault and the crime of risk of injury to a child, we decline to identify the victim or others through whom her identity may be ascertained. See General Statutes § 54-86e.

[4] The victim testified through an interpreter.

three separate occasions, the defendant[5] engaged in sexual acts with the victim against her will. First, the defendant touched the victim's breasts by licking and biting them in the spring of 2001, when the victim was about twelve years old. The defendant inserted his finger into the victim's vagina in the winter of 2001. In the late fall or early winter of 2002, the defendant licked the victim's vagina and forced her to perform oral sex on him. The defendant also caused his penis to come in contact with the victim's breasts. The defendant is the father of the victim's three younger half-sisters and was in a relationship with the victim's mother at all relevant times. The victim was fifteen at the time she testified and was reluctant to testify because it made her uncomfortable.

Allegations of the defendant's sexual abuse of the victim were reported anonymously to the department of children and families (department). Thereafter, police officers and a department employee went to the victim's home to investigate. As a result of their investigation, the victim was taken to the Yale-New Haven Hospital child sex abuse clinic where she was examined.

The defendant took the witness stand in his defense and testified that he had been a loving father to the victim. He also testified that the victim had fabricated the allegations against him because she was jealous about having to share family resources with her half-sisters or that her grandmother and uncle had encouraged her to make the allegations because of a dispute they had had with the defendant and the victim's mother. The defendant is proficient in American sign language, able to communicate with the victim and served as her communicator both within and outside of the family. The victim's mother had only a basic

---

[5] The victim referred to the defendant as her stepfather.

command of American sign language. We will address additional facts as necessary.

## I

The defendant claims that he was denied the constitutional right to a fair trial due to prosecutorial impropriety that occurred during the examination of witnesses and closing argument. Specifically, the defendant claims that during final argument, the prosecutor improperly (1) appealed to the emotions of the jury, (2) vouched for the victim's credibility, (3) referred to facts that were not in evidence and (4) commented on the defendant's silence in response to questions from an investigating police officer. We are unpersuaded.

"[T]he touchstone of due process analysis in cases of alleged [harmful] prosecutorial [impropriety] is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's [actions at trial] so infected [it] with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial . . . we must view the prosecutor's [actions] in the context of the entire trial. . . .

"[I]t is not the prosecutor's conduct alone that guides our inquiry, but, rather, the fairness of the trial as a whole. . . . We are mindful throughout this inquiry, however, of the unique responsibilities of the prosecutor in our judicial system. A prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his [or her] office, [the prosecutor] usually exercises great influence upon jurors. [The prosecutor's] conduct and language in the trial of cases in which human life or liberty [are] at stake should be forceful, but fair, because he [or she] represents the public interest, which

demands no victim and asks no conviction through the aid of passion, prejudice or resentment. If the accused be guilty, he [or she] should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe." (Internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 32–33, 917 A.2d 978 (2007).

During trial, the defendant failed to object to the alleged instances of prosecutorial impropriety he raises on appeal. Nonetheless, we will review the claims because the keystone of "appellate review of claims of prosecutorial [impropriety] is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by [our Supreme Court] in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)."[6] *State* v. *Stevenson*, 269 Conn. 563, 573, 849 A.2d 626 (2004). "[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. Put differently, [impropriety] is [impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] caused or contributed to a due process violation is a separate and distinct question . . . ." (Internal quotation marks omitted.) Id., 572.[7]

---

[6] "In determining whether prosecutorial [impropriety] was so serious as to amount to a denial of due process, [our reviewing] court[s], in conformity with courts in other jurisdictions, [have] focused on several factors. Among them are the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) *State* v. *Williams*, supra, 204 Conn. 540.

[7] We analyze the defendant's claims under the federal constitution despite the defendant's claim that our state constitution may provide him with greater due process protection. The defendant has failed to identify any

A

The defendant first claims that the prosecutor improperly appealed to the emotions of the jury by eliciting certain testimony from an expert witness and then using that evidence during final argument. To the extent that the defendant's claim concerns the testimony of an expert witness, it is an unpreserved evidentiary claim that is not reviewable because the defendant failed to object timely to the testimony. See *State* v. *Rowe*, 279 Conn. 139, 149–52, 900 A.2d 1276 (2006). To the extent that the claim focuses on the prosecutor's use of the evidence during final argument, we conclude that there was no impropriety.

The following facts are relevant to the defendant's claim. The state called Lisa Kuntz, a licensed and school certified psychologist at the American School for the Deaf, to testify. She gave extensive testimony on the cognitive and language development of a deaf person and the culture of the world of the deaf, including testimony that "studies worldwide suggest that the fact of a disability places a child at 50 percent greater risk for being abused or neglected." The defendant did not object to the question posed by the prosecutor,[8] nor did he move to strike the testimony.

1

On appeal, the defendant claims that Kuntz' testimony improperly invited "the jury to believe the victim's testimony merely because the victim is disabled."

authority supporting the proposition that our state constitution provides greater protection against prosecutorial impropriety than the federal constitution. The cases cited by the defendant are inapposite. In *State* v. *Warholic*, 278 Conn. 354, 897 A.2d 569 (2006), our Supreme Court declined to extend the protection afforded under article first, §§ 8 and 9, of the constitution of Connecticut to cases of prosecutorial impropriety. See id., 405 n.29.

[8] The prosecutor asked Kuntz: "Doctor, in general, can you comment on whether there's any special vulnerability or any studies on the vulnerability of children who are deaf and unable to speak?"

Although our Supreme Court has held that unpreserved claims of prosecutorial impropriety are to be reviewed under the *Williams* factors, that rule does not pertain to mere evidentiary claims masquerading as constitutional violations. The defendant has failed to bring to our attention any law that expert testimony related to the vulnerability of a disabled population is constitutionally improper. Thus, he has not removed the allegedly objectionable testimony from the realm of an evidentiary claim. Evidentiary claims do not merit review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), because they are not of constitutional magnitude. "[R]obing garden variety claims [of an evidentiary nature] in the majestic garb of constitutional claims does not make such claims constitutional in nature. . . . Putting a constitutional tag on a nonconstitutional claim will no more change its essential character than calling a bull a cow will change its gender." (Internal quotation marks omitted.) *State* v. *Rosario*, 99 Conn. App. 92, 99 n.6, 912 A.2d 1064, cert. denied, 281 Conn. 925, 918 A.2d 276 (2007).

The defendant may not transform an unpreserved evidentiary claim into one of prosecutorial impropriety to obtain review of the claim. See *State* v. *Rowe*, supra, 279 Conn. 149. An appellate court "shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. . . . Practice Book § 60-5. . . . *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, 267 Conn. 279, 335, 838 A.2d 135 (2004) (because review is limited to matters in record, court will not address issues not decided by trial court). In addition, [o]ur rules of procedure do not allow a [party] to pursue one course of action at trial and later, on appeal, argue that a path he rejected should now be open to him. . . . To rule otherwise would permit trial by ambuscade." (Citation omitted; internal quotation marks omitted.) *State* v. *Rowe*, supra, 149–50.

2

The defendant also claims that the prosecutor made repeated reference to Kuntz' testimony during opening and closing statements, thus arousing the emotions, particularly the sympathy, of the jury. In his brief, the defendant constructs his claim by isolating the following words used by the prosecutor: "powerless and vulnerable to multiple sexual assaults,"[9] a "vulnerable, young deaf girl," and the "trapped, difficult world of a deaf child with no speech," who was "powerless and vulnerable to multiple sexual assaults."[10] At oral argument, the defendant claimed that these repeated sympathetic references to the victim improperly appealed to

[9] After greeting the jurors and the court, the prosecutor stated: "The evidence in this case will show you a twelve to thirteen year old girl who was powerless and vulnerable to multiple sexual assaults by the man who was her mother's boyfriend. He had, according to the evidence, been her mother's boyfriend for many years, and in fact [the victim's] mother . . . had three children by the defendant. The only child in the family who was not the defendant's child was [the victim]. When she comes in to testify today, you will see a fifteen year old girl. She is a girl who is deaf and has been deaf since birth. She cannot speak. She will sign her answers."

[10] The prosecutor began her final argument as follows: "Good afternoon, ladies and gentlemen. You've heard the evidence in this case, and now the question before you is a question of credibility. Is [the victim] a vulnerable, believable deaf child or is [the victim] a calculating, vengeful person? That's really what it comes down to after the evidence that you've seen, the witnesses who you've observed. You were able to see her testimony and the testimony of a number of state's witnesses, wherein she told you and related to you her victimization at the hands of the person who she called her stepfather. You've heard the defense that she's a vengeful person put up to it by a grandmother who can't even speak sign language.

"Let's go through the evidence in the case, [and] I think what you'll see is that the evidence shows that there is only one way that all of this makes any common sense, and that is, when you listen to the very visual, very poignant, very strongly emotional language, as it was called in evidence, of [the victim]. . . .

"[T]his southeast bedroom of the house, the bedroom that had been her mom's bedroom, the bedroom that the evidence, in common sense, would say should be the safest haven for any child, perhaps especially for a disabled child—should not their mother's bedroom be the one place in the world where they should feel secure and safe—but what [the victim] told you is that that bedroom became not the safe haven of a child to run to when it

the emotions of the jury and that the victim's disability was irrelevant to the crimes with which the defendant was charged. The state argues that the victim's disability was relevant to its theory of the case, i.e., that the defendant took advantage of her disability, especially in light of the fact that he was the person in the house who learned to use sign language and on whom the victim depended for communication. We agree with the state.

It has long been held that "[a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal. . . . Therefore, a prosecutor may argue the state's case forcefully, [but] such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Ceballos*, 266 Conn. 364, 394, 832 A.2d 14 (2003). Nonetheless, "closing arguments often have a rough and tumble quality about them, [and] some leeway must be afforded to

lightninged or stormed, but it became her chamber of horrors, and [the victim] told you that the first time that [the defendant], her stepfather, the man in charge of the house, the one who ran the tight ship, took her in to that bedroom. . . .

"This was a young deaf girl. Her only language was learned at school. Her only relative, or what you might call a relative, who even made a serious attempt to learn sign language, was the defendant. Her own mother didn't speak fluent sign language, and this is the person who took her to that chamber of her own horror and began molesting her . . . .

"The defendant, on the second occasion, took her into the bedroom and again he molested her. This time, he engaged in digital penetration with her, and she indicated that that was the most outstanding act of this molestation, and I think that all of you, using your common sense, can evaluate her testimony and understand what has to be going on in the trapped, difficult world of a deaf child with no speech, who can only sign—and at home can only sign, really, with the perpetrator . . . ."

the advocates in offering arguments to the jury in final argument. [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Necaise*, 97 Conn. App. 214, 229, 904 A.2d 245, cert. denied, 280 Conn. 942, 912 A.2d 478 (2006).

The facts are that the victim was a child at the time of the relevant events[11] and that she is deaf and unable to speak. She testified by using sign language through an interpreter. She was unable to pinpoint the exact time of the defendant's criminal acts; she was an embarrassed and reluctant witness. It was the prosecutor's responsibility during final argument to place all of this information in a reasonable context on the basis of the evidence. Assuming, without deciding whether Kuntz' testimony at issue was admissible, once the testimony was in evidence, the prosecutor was permitted to use it during final argument; see *State* v. *Arline*, 223 Conn. 52, 59, 612 A.2d 755 (1992); for the jury to consider in reaching its verdict. *State* v. *Hickey*, 23 Conn. App. 712, 718, 584 A.2d 473, cert. denied, 217 Conn. 809, 585 A.2d 1233, cert. denied, 501 U.S. 1252, 111 S. Ct. 2894, 115 L. Ed. 2d 1058 (1991). This court previously has held that it was not improper for the prosecutor to refer to

[11] The victim's age was relevant to two of the three charges against the defendant. General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ."

General Statutes § 53-21 (a) (2) provides in relevant part that a person is guilty of risk of injury to a child when he "has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . ."

the victim as vulnerable when the argument amounted to a reasonable inference from the testimony at trial. See *State* v. *Glenn*, 97 Conn. App. 719, 731, 906 A.2d 705 (2006) (victim mentally challenged), cert. denied, 281 Conn. 913, 916 A.2d 55 (2007).

On the basis of the evidence and our review of the entire final argument,[12] we cannot say that the prosecutor's argument strayed beyond the evidence or the inferences the jury reasonably could draw from it. There was evidence that the defendant was the only person in the victim's family who was competent to use sign language, and he communicated for the victim. When the victim wrote a note to her mother about the abuse, the defendant intercepted it. Kuntz gave extensive testimony about the language acquisition of a nonhearing and nonspeaking person and how American sign language is linguistically different from English. Also, the evidence indicated that deaf children acquire the ability to think abstractly later than nondisabled children and that they have difficulty with the concept of time and need visual cues to track time. Defense counsel cross-examined the victim at length about the time the abuse occurred. Furthermore, the defendant's theory was that the victim falsely accused him of sexual abuse because she was jealous of her half-sisters and that her grandmother had put her up to it.[13]

---

[12] The transcript reveals the following colloquy between the prosecutor and the court:

"The Court: Is there anything else to take up before we break?

"[The Prosecutor]: Your Honor, I just want to note, closing arguments are done. Counsel raised no objection to closing argument. If she had, I would ask the court to give instructions, and I would hope that if the court finds anything amiss, that the court would sua sponte do so.

"The Court: I would have—I found nothing amiss with any of the arguments presented, so, I think no instruction is necessary. All right, we'll break then, for the day, as I said, and we'll resume tomorrow morning at ten o'clock with the final instructions. Have a good night, everyone."

[13] We note that it is not uncommon for the person accused of sexually assaulting a child to assert as a defense ulterior motives on the part of a victim to make an allegation of sexual abuse. See, e.g., *State* v. *Williams*,

The defendant would have us reverse his conviction on the basis of our Supreme Court's holdings in *State* v. *Alexander*, 254 Conn. 290, 755 A.2d 868 (2000), and *State* v. *Williams*, supra, 204 Conn. 545–46. Those cases are distinguishable on the facts. "An appeal to the emotions of the jury may arise from the use of personal and degrading epithets to describe the defendant. . . . Although a prosecutor may argue that the evidence supports the defendant's guilt, he may not brand the defendant guilty with the use of such epithets." (Citation omitted.) *State* v. *Alexander*, supra, 307. In *Williams*, "the prosecutor repeatedly engaged in character assassination and personal attacks on both the defendant and his key witness . . . ." *State* v. *Williams*, supra, 546. The prosecutor in this case did not employ epithets to describe or brand the defendant or engage in character assassination of the defense witnesses during her opening or closing arguments.

Finally, the fact that the court did not find anything amiss with the final arguments weighs heavily in our minds. See footnote 12. The court was present to hear and see the arguments and was able to observe the jury. As appellate courts repeatedly have said with respect to the credibility of a witness' words, a reviewing court cannot discern credibility on the basis of the words printed on a page. Words do not convey facial expressions, physical gestures and vocal intonation. See, e.g., *State* v. *Calabrese*, 279 Conn. 393, 403–404, 902 A.2d 1044 (2006). The same reasoning applies to our review of factually accurate statements isolated from the prosecutor's final argument. In this case, when asked, the court responded that it found nothing improper about the final arguments of either counsel. That presumably

102 Conn. App. 168, 926 A.2d 7 (2007) (victim lied about abuse to avoid being returned to care of mother).

included appeals to the sympathy of the jury.[14] We have reviewed the record and determined that there was a basis in evidence for the prosecutor's referring to the victim as vulnerable.

B

The defendant's second claim is that the prosecutor vouched for the victim's credibility by (1) asking the jury: "Is that something somebody would make up?" and (2) eliciting inappropriate testimony from a hospital social worker. We do not agree.

"[I]t is well established that the evaluation of [witnesses'] testimony and credibility are wholly within the province of the trier of fact. . . . The prosecutor may not express his own opinion, either directly or indirectly, as to the credibility of witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony. . . . These expressions of opinion are particularly difficult for the jury to ignore because of the special position held by the prosecutor. . . . The jury is aware that he has prepared and presented the case and consequently, may have access to matters not in evidence . . . which the jury may infer to have precipitated the personal opinions. . . . While the prosecutor is permitted to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom, he is not permitted to vouch personally for the truth or veracity of the state's witnesses." (Citation omitted; internal quotation marks omitted.) *State* v. *D'Haity*, 99 Conn. App. 375, 389, 914 A.2d 570 (2007).

---

[14] The court also charged the jury in part not to be "influenced by any personal likes or dislikes, opinions, prejudices or *sympathy*." (Emphasis added.) A jury is presumed to follow the court's instruction unless there is a clear indication to the contrary. *State* v. *Negron*, 221 Conn. 315, 331, 603 A.2d 1138 (1992).

1

The defendant claims that it was improper for the prosecutor to ask the jury, "Is that something somebody would make up?" We disagree and conclude that the use of a rhetorical question, such as this, is proper argument.

We review the argument that the defendant claims is improper in the context in which it was used. See *State* v. *Warholic*, 278 Conn. 354, 364 nn.4–5, 897 A.2d 569 (2006). The prosecutor argued in part: "What did she tell you in her visual language happened the third time that [the defendant] brought her into that southeast bedroom? She told you he molested her again. She told you that he forced her head down on his penis . . . . I do not have the words to describe her testimony, [but] you were here and saw. You were the witnesses to her visual language, to her looking at you and describing what she called the 'BJ.' When she did that, ladies and gentlemen, is she a believable, vulnerable, young deaf girl, or did you view her as a vengeful calculating person?

"The evidence speaks for itself. And what did she say happened when he forced her down on his penis? She said white stuff came out, and she told you here that, 'Well, gee, I know what it is now,' and she spelled it out. It's c-u-m. 'I did not know what it was then.' And what's the [corroboration] of that? Remember Leia Smith's testimony? Leia Smith from Yale, licensed clinical social worker . . . said that when this child was describing to her the forced fellatio, that the child said, 'white stuff came out.' Do you remember [what] Leia Smith told you she said? As Leia Smith was questioning her, the girl says, 'What was that stuff?' And Leia described her affect. She said she was dumbfounded. This is a trained professional social worker evaluating her. The kid was dumbfounded. Leia Smith said, 'Well,

I paused. I tried to answer.' But you know, her job's to ask the questions, and she said this child was truly dumbfounded, 'What's that white stuff?' And, common sense, you know what the white stuff is, [and the victim] told you she now knows what it was. But on that day, and by the calendar, we know she underlined, it was in October, November or December of 2002 when he forced her head down on his penis; she didn't know what it was.

"What's a true test [of] credibility? It's when somebody tells something they really couldn't know or wouldn't experience from something else. Now, Leia Smith, could she fool her? Could she fool her that she's dumbfounded? Well, that's for you to decide. But think, because that wasn't the end of it. She told us she bled. She also said, 'Gee, there was only digital penetration the second time.' How does that all make sense? . . .

"Ladies and gentlemen, in the winter of 2002, you have a young girl in her mother's bedroom, who has been forced to commit fellatio, who for the first time experiences semen in a way that, the defense brought it out, she didn't want to learn about that stuff until she was eighteen years old. And what does she tell you she did? She tells you she went and brushed her teeth when it was over. *Is that something somebody would make up?* Is that something a kid would make up, or is that not the kind of act that, based on the evidence here, proves to you the credibility of this child, when she tells you what happened?" (Emphasis added.)

After reviewing the allegedly improper rhetorical question in the context of the final argument, we conclude that it was proper argument and that it did not amount to the prosecutor's vouching for the victim's credibility. "A prosecutor may properly comment on the credibility of a witness where such comment reflects reasonable inferences from evidence adduced at trial."

*State* v. *Coney*, 266 Conn. 787, 812, 835 A.2d 977 (2003). "Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case." (Internal quotation marks omitted.) *State* v. *D'Haity*, supra, 99 Conn. App. 384.

Credibility frequently is the sole issue in cases of sexual abuse. A prosecutor may ask the jury to apply common sense and experience to determine credibility. *State* v. *Warholic*, supra, 278 Conn. 366. The question at issue was designed to prompt the jury to assess the issue of credibility that the prosecutor had presented in her opening remarks, that is, whether the victim was a vulnerable deaf child or a vengeful stepdaughter, as the defendant claimed. We conclude therefore that the prosecutor did not improperly vouch for the victim's credibility by asking the members of the jury: "Is that something somebody would make up?"

2

The defendant also claims that the prosecutor improperly elicited evidence as to whether the victim was vengeful from the social worker who interviewed her and then used that testimony in the closing argument to bolster the victim's credibility. Again, the state points out that the defendant did not object to the testimony at the time it was elicited and contends that the claim is not reviewable pursuant to *State* v. *Rowe*, supra, 279 Conn. 149–52. The state's argument has merit.

We first must determine whether the prosecutor elicited testimony from the witness that reflected on the victim's veracity. The following direct examination of

Smith by the prosecutor forms the basis of the defendant's claim:

"[The Prosecutor]: Now, can you tell the ladies and gentlemen of the jury, as part of your protocol, what, if anything, you're trained to do to observe to—if anything—to try to discern false reports?

"[The Witness]: Um, really, my training is focused on the fact-finding part of the interview and asking very open-ended questions, but in doing that I do look for consistency of what the child is telling me, if the child is able to give details. If the—if the story the child is saying is coherent. Those are some things I look for.

"[The Prosecutor]: Okay. Now, in this case, can you tell us what, if any indications of vengeance you discern[ed] in the court of this interview?

"[The Witness]: I didn't see any vengeance.

"[The Prosecutor]: And is that something you'd be looking for if it was there?

"[The Witness]: I think I would be listening for that.

"[The Prosecutor]: And, again, in this case?

"[The Witness]: I didn't hear anything or see anything like that."

We conclude that the prosecutor did not ask the witness to comment on the victim's veracity.

"A prosecutor may not ask any witness to comment on the credibility or veracity of another witness' testimony." *State* v. *Beaulieu*, 82 Conn. App. 856, 869, 848 A.2d 500 (2004), rev'd in part on other grounds, 274 Conn. 471, 876 A.2d 1155 (2005). "Several reasons underlie the prohibition on such questions. First, it is well established that determinations of credibility are for the jury, and not for witnesses. . . . Consequently, questions that ask a defendant to comment on another

witness' veracity invade the province of the jury. . . .
Moreover, [a]s a general rule, [such] questions have no
probative value and are improper and argumentative
because they do nothing to assist the jury in assessing
witness credibility in its fact-finding mission and in
determining the ultimate issue of guilt or innocence.
. . .

"Second, questions of this sort also create the risk
that the jury may conclude that, in order to acquit the
defendant, it must find that the witness has lied. . . .
This risk is especially acute when the witness is a gov-
ernment agent in a criminal case. . . . A witness' testi-
mony, however, can be unconvincing or wholly or
partially incorrect for a number of reasons without any
deliberate misrepresentation being involved . . . ."
(Citations omitted; internal quotation marks omitted.)
*State* v. *Singh*, 259 Conn. 693, 707–708, 793 A.2d 226
(2002).

We conclude, given the context in which the ques-
tions and answers occurred, that the prosecutor's exam-
ination of Smith was not a violation of the rule against
asking a witness to comment on the credibility of
another witness. The prosecutor asked the witness if
she was trained to discern false reports of sexual abuse.
Smith responded that her function was that of a "fact
finder" but that she also looked for consistency in
reporting and details. The prosecutor also asked Smith
if, during the course of her interview with the victim,
she saw signs of revenge or vengeance, as the defendant
claimed. Smith testified that she did not. The question
and response were predicated on Smith's role in the
chain of medical treatment. Neither the question nor
the answer concerned an assessment of the victim's
credibility, although the jury was free to use the testi-
mony in its assessment of the credibility issue before
it—whether the defendant sexually assaulted the victim

or the victim falsely reported sexual abuse for reasons of vengeance, as the defendant claimed.[15]

As we held with respect to the evidentiary issue in part I A 1, a defendant may not transmute an unpreserved evidentiary claim into one of constitutional proportions to obtain appellate review. See *State* v. *Rosario*, supra, 99 Conn. App. 99 n.6.

C

The defendant's third claim of prosecutorial impropriety is that the prosecutor referred to facts outside the record to denigrate the victim's mother, who was the defendant's girlfriend, to cast him in a negative light to inflame the passions of the jury.[16] The defendant's claim is unsupported by the record.

[15] Pursuant to Practice Book § 67-10, the defendant indicated that *State* v. *Ritrovato*, 280 Conn. 36, 905 A.2d 1079 (2006), was relevant to the issues in this appeal. We see no similarity between the issues in this case and the ones in *Ritrovato*.

The first issue in *Ritrovato* was whether the trial court improperly excluded evidence of the victim's prior sexual history that the defendant had proffered. The victim had testified on direct examination for the state that she was a virgin at the time of the defendant's sexual assault. Id., 44–50. Our Supreme Court concluded that the exclusion of the evidence in that case was a harmful *evidentiary error*, not one of constitutional magnitude. Id., 50. In this case, there is no claim that the court improperly excluded evidence offered by the defendant.

The second issue in *Ritrovato* was whether the prosecutor deprived the defendant of his constitutional right to due process by asking a counselor with Planned Parenthood of Connecticut, Inc., who had extensive experience with victims of sexual abuse, whether the victim in that case had been credible when describing the abuse she had alleged. The counselor responded, " 'Oh, yes.' " Id., 60 n.19. The prosecutor also made a single reference to the credibility of that testimony during closing argument to the jury. Id., 60–61.

Again, we note that the prosecutor in this case did not ask any of the witnesses whether the victim was credible. The prosecutor also did not ask Smith to characterize the victim's testimony in violation of *State* v. *Singh*, supra, 259 Conn. 702. Smith was asked whether she perceived any evidence of vengeance or revenge on the part of the victim, a question consistent with Smith's view of herself as a "fact finder" for purposes of medical treatment.

[16] To place the alleged improper language in context, we quote the relevant portion of the prosecutor's final argument, which referred to Erlinda Garnes,

In his brief, the defendant argued: "In her closing argument, the prosecutor referred to the testimony of Erlinda Garnes that the victim's mother had wanted to go to Georgia and leave the victim behind, inviting the jury to speculate as to the absence of the victim's mother at the trial: 'Erlinda Garnes told you why mom is not here.' . . . Erlinda Garnes had testified regarding the victim's mother, but had not stated in her testimony the specific reason for the victim's mother's absence at the trial." (Citation omitted.)

In its brief, the state brought the following testimony by Garnes to our attention:

"[The Prosecutor]: After you finished at [the] Yale sexual abuse clinic, did you have another meeting in connection with this case that day?

"[The Witness]: Yes.

"[The Prosecutor]: And what meeting was that?

"[The Witness]: I had a supervised visit between [the victim's mother] and the [victim] at the department of children and families.

"[The Prosecutor]: Okay. And at this point, can you tell us what, if any, opportunity you had to talk with [the victim's mother]?

"[The Witness]: Well, I sat in for the entire visit, and I did speak with [the victim's mother].

a department employee who participated in the investigation of the defendant's sexual abuse of the victim: "Was it easy for [the victim] to come in here and begin this testimony? And as you think about that, there may be another question that comes to your mind. Where's her mom? Erlinda Garnes told you. Erlinda Garnes went to court to get a neglect petition on the mom. Erlinda Garnes told you why mom is not here. Mom told Erlinda Garnes she wanted to go to Georgia and leave [the victim] behind. All of the evidence in this case—[the defendant] is mom's boyfriend. [The defendant] considered himself in the role of mom's husband. So, ladies and gentlemen, common sense, common sense, where's mom? Erlinda Garnes told you. Mom, according to Erlinda Garnes, mom is ready to go without the victim."

"[The Prosecutor]: And was there a point where you called in someone else from [the] department of children and families?

"[The Witness]: I called in my supervisor.

"[The Prosecutor]: Why?

"[The Witness]: Because [the victim's mother] said she was leaving for Georgia, and she was leaving [the victim] behind."[17]

The state also contends that the prosecutor's question concerning the whereabouts of the victim's mother has both a literal and figurative meaning. The literal meaning was that the mother had reported that she was going to go to Georgia without the victim. The figurative meaning was that she was absent from the victim's life in that she did not support her daughter when she reported the defendant's sexual abuse. In other words, the prosecutor sought to explain to the jury how difficult it was for the victim to come forward to report and testify about the defendant's abuse because her mother did not stand by her.[18]

---

[17] The commissioner of the department subsequently filed a neglect petition against the victim's mother with respect to the victim.

[18] In support of the more figurative construction of the prosecutor's argument, the state has referred to the testimony of the two police officers who investigated the report of sexual abuse at the victim's home on January 17, 2003. Officer Gerald Tenney is a member of the Ansonia police department, its youth officer and a member of the Milford interdisciplinary task force on sexual assault. He received a referral from the department concerning the victim and arranged to meet Garnes at the victim's home to conduct an investigation. The victim's mother led the two to the victim's bedroom and told them that the victim could read lips and write answers to questions. The victim indicated to Tenney that the defendant had sexually assaulted her. During the interview, the victim asked to see her mother, who entered the room and communicated in sign language with the victim. While the victim was conversing with her mother, she was looking at Tenney and shaking her head, no. The victim's mother then told Tenney and Garnes that the victim's grandmother and uncle had put her up to the allegations of sexual abuse.

As is customary in such situations, a backup officer was sent to the victim's home during the investigation. Officer Brian Harte arrived after

On the basis of our review of the record, we conclude that the prosecutor's argument did not incorporate facts outside the record, as the prosecutor asked the jury to draw reasonable inferences from the facts in evidence. The defendant's claim therefore fails.

D

The defendant's last claim of prosecutorial impropriety is that the prosecutor brought to the jury's attention, both in questioning and in argument, the defendant's silence in the face of a police officer's informing him that the victim had accused him of sexual assault. The defendant's claim lacks merit.

The state again has posited that the evidentiary portion of the defendant's claim with respect to his silence is not reviewable because he did not object to the line of questioning at trial. See *State* v. *Rowe*, supra, 279 Conn. 149–52. As we did previously, we first must determine whether the claim is of constitutional magnitude or merely an evidentiary one. We conclude that the claim is of an evidentiary nature.

The following facts pertain to our determination. After he had spoken with the victim and Officer Brian Harte of the Ansonia police department had confirmed the substance of her claims of abuse, Officer Gerald Tenney of the Ansonia police department confronted the defendant. At the time of the confrontation, the defendant had not been apprised of his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16

Tenney's interview with the victim had begun. Coincidentally, Harte has a rudimentary knowledge of American sign language. Tenney asked Harte, therefore, to communicate with the victim to confirm or dispel what was written on a piece of paper. The victim also demonstrated physically to Harte what the defendant had done to her. As Harte was communicating with the victim, her mother entered the room and communicated in sign language to the victim. Although he could not follow the entire conversation, Harte determined that the victim and her mother disagreed. The victim indicated to Harte that she was afraid of the defendant and her mother.

L. Ed. 2d 694 (1966). Tenney testified without objection that he had questioned the defendant and had learned that the defendant had no problems with the victim and that he had been alone with her several times. When Tenney told the defendant of the victim's allegations, the defendant put his head down, did not look at Tenney and said nothing.[19] The prosecutor also addressed the subject of the defendant's silence on cross-examination when the defendant testified:

---

[19] The following exchange occurred during the prosecutor's examination of Tenney:

"[The Prosecutor]: And can you tell us what, if anything, you said about why you were there?

"[The Witness]: I asked him if he knew why we were there, and he had told me that he was told by other family members that he was supposedly sexually assaulting her, um, here at the house and at the grandmother's house.

"[The Prosecutor]: Okay, and what did you say? Anything else to him?

"[The Witness]: Yes, I asked him if . . . if he got along with the victim or was she a problem to him, and he'd said no, that she wasn't a problem to him.

"[The Prosecutor]: Okay, and what did he say about getting along with her?

"[The Witness]: He said he got along well with her.

"[The Prosecutor]: What if any further conversation did you have with him about [the victim] and his . . . .

"[The Witness]: I told him that we needed to investigate this and that children usually don't make up these sort of things, these sexual . . . abuse allegations.

"[The Prosecutor]: What if any questions did you ask about his either being with her, with other people, or without other people?

"[The Witness]: I asked him if he was ever alone with the victim, and he had told me he had been alone with her on a few occasions.

"[The Prosecutor]: Okay, can you tell the ladies and gentlemen of the jury whether or not you told him he was being accused of child sexual abuse?

"[The Witness]: Yes, I told him that the victim had disclosed that he had sexually assaulted her.

"[The Prosecutor]: And can you tell the jury what, if anything, he did when—when you told him that?

"[The Witness]: He put his head down. He sat on the couch, he put his [head] down and he didn't—he didn't look at me, nor did he say anything to me.

"[The Prosecutor]: And did he ever deny to you that day that he did anything?

"[The Witness]: No, he never denied it, no."

"[The Prosecutor]: And, in fact, when Officer Tenney accused you of child molestation you were silent, weren't you?

"[The Defendant]: Yes.

"[The Prosecutor]: Now . . . you've just been accused of molesting the person you say you considered to be your oldest daughter, is that correct?

"[The Defendant]: Yes.

"[The Prosecutor]: And you're accused by a youth officer from the Ansonia police department?

"[The Defendant]: Yes.

"[The Prosecutor]: You can see where someone might expect you to say, 'Child molestation? No way?' You can see where somebody can expect that, wouldn't you?

"[The Defendant]: Yes.

"[The Prosecutor]: You can see where somebody would expect you to say, 'My own daughter?' You can see where they'd expect that, wouldn't you?

"[The Defendant]: Yes.

"[The Prosecutor]: But your response, sir, was silence, wasn't it? Yes or no . . . .

"[The Defendant]: Yes."

There is no dispute that the defendant was not in custody at the time of the questioning. We conclude that the defendant's claims with respect to the testimony cited are unpreserved evidentiary claims, which we will not review. See *State* v. *Rowe*, supra, 279 Conn. 149–52. A defendant has not suffered a violation of due process at trial where his pre-*Miranda* silence is brought to the attention of the jury. See *State* v. *Plourde*,

208 Conn. 455, 466, 545 A.2d 1071 (1988), cert. denied, 488 U.S. 1034, 109 S. Ct. 847, 102 L. Ed. 2d 979 (1989).[20]

The defendant also argues that the prosecutor's inquiry constituted prosecutorial impropriety in violation of *this* court's decision in *State* v. *Stevenson*, 70 Conn. App. 29, 38, 797 A.2d 1 (2002) (prosecutor forced defendant to describe police witnesses as liars), rev'd, 269 Conn. 563, 849 A.2d 626, after remand, 85 Conn. App. 811, 858 A.2d 876 (2004). The prosecutor in this case did not compel the defendant to call police witnesses or anyone else a liar. We also conclude that the prosecutor's examination of the defendant was unlike that of the prosecutor in *State* v. *Williams*, supra, 204 Conn. 541 n.7, 546 n.9, 547 nn.10–12, in which the prosecutor resorted to vituperative name-calling and sarcasm.

[20] "In *Doyle* v. *Ohio*, [426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976)], the United States Supreme Court held that the impeachment of a defendant through evidence of his silence following his arrest and receipt of *Miranda* warnings violates due process. The court based its holding on two considerations: First, it noted that silence in the wake of *Miranda* warnings is 'insolubly ambiguous' and consequently of little probative value. Second and more important, it observed that 'while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.' *Doyle* v. *Ohio*, supra, 617–19. The court . . . reaffirmed *Doyle*'s reasoning in *Wainwright* v. *Greenfield*, 474 U.S. 284, 290, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986), in which it held that the defendant's silence following his arrest and receipt of *Miranda* warnings could not be used at trial to rebut his defense of insanity. The court reasoned: 'The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony. . . .' Id., 292. Consistent with this rationale, the court has concluded that use at trial of silence *prior* to the receipt of *Miranda* warnings does not violate due process. *Fletcher* v. *Weir*, 455 U.S. 603, 102 S. Ct. 1309, 71 L. Ed. 2d 490 (1982) (postarrest silence); *Jenkins* v. *Anderson*, 447 U.S. 231, 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980) (prearrest silence; see *Wainwright* v. *Greenfield*, supra, 291 n.6." (Emphasis in original.) *State* v. *Plourde*, supra, 208 Conn. 465–66.

Because the testimony concerned the defendant's silence in the face of the victim's allegations of sexual abuse, it was not improper for the prosecutor to use that evidence during final argument.[21] The prosecutor committed no impropriety by either inquiring into or arguing about the defendant's silence when the defendant was confronted by Tenney.

We conclude, for all of the reasons cited, that there was no prosecutorial impropriety.[22]

## II

The defendant claims that the court abused its discretion by permitting a social worker to testify as to her interview with the victim under the medical treatment or advice exception to the hearsay rule embodied in § 8-3 (5) of the Connecticut Code of Evidence.[23] The defendant's claim is not reviewable.

---

[21] The prosecutor argued in part: "We have a couple of times where [the defendant] wants to have it both ways. He wants to have it both ways when we're talking about [Officer] Tenney and discussions about whether or not he got along with the young lady. If you remember, he has told [Officer] Tenney, according to [Officer Tenney], 'no problems,' and then he comes in here and he says to you that both are correct: no problems and she's vengefully out to get him because her life is so miserably changed since three other kids came into the world. . . . [T]here's an expression in life, 'you can't have it both ways.' Either there are no problems or there's problems. You heard Officer Tenney's testimony, and Officer Tenney's testimony stands in respect in direct contradiction to the testimony of the defendant, and there's one way that's especially compelling. You'll recall youth Officer Tenney describing how [the defendant] put his head down and was silent when he accused him of child molestation. And this defendant denies that and says he did not put his head down. He never met with—never met with youth Officer Tenney. He had every opportunity to explain all of the problems he claimed he was having with this child."

[22] Because we conclude that no prosecutorial impropriety occurred during trial, there is no need to apply the *Williams* factors. See *State v. Stevenson,* supra, 269 Conn. 563.

[23] Section 8-3 of the Connecticut Code of Evidence provides in relevant part: "The following are not excluded by the hearsay rule, even though the declarant is available as a witness . . . (5) . . . A statement made for purposes of obtaining medical treatment or advice pertaining thereto and describing medical history, or past or present symptoms, pain, or sensations,

The following facts are relevant to the defendant's claim. The state called Smith to testify about her interview with the victim following her physical examination. The defendant objected to Smith's testimony, claiming that she had not been disclosed as an expert witness. The prosecutor responded that Smith was not testifying as an expert but as an individual who provided medical treatment or advice to the victim. The court ruled that Smith was not testifying as an expert and that her report had been given to the defendant in a timely fashion. The defendant also objected to Smith's testimony on the basis of constancy of accusation evidence. See *State* v. *Samuels*, 273 Conn. 541, 871 A.2d 1005 (2005). The court concluded that Smith's testimony was being offered pursuant to the medical treatment exception to the hearsay rule, not for constancy of accusation. The defendant did not object to Smith's testimony on the basis of the medical exception rule to the hearsay doctrine.[24]

"[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to

or the inception or general character of the cause or external source thereof, insofar as reasonably pertinent to the medical treatment or advice."

[24] Smith testified that she is part of the team at the Yale-New Haven Hospital child sex abuse clinic and that the victim was referred to her by a nurse practitioner who had conducted a physical examination of the victim. The role of the social worker is to conduct a forensic interview to get a clear statement of the allegations of abuse and determine whether the child needs to be tested for any type of sexually transmitted disease or referred for further examination.

"[S]tatements made by a sexual assault victim to a social worker who is acting within the chain of medical care may be admissible under the medical treatment exception to the hearsay rule." *State* v. *Cruz*, 260 Conn. 1, 10, 792 A.2d 823 (2002).

apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted." (Internal quotation marks omitted.) *State* v. *Calabrese*, supra, 279 Conn. 408 n.18.

The defendant did not object to Smith's testimony pursuant to the medical exception rule to the hearsay doctrine. The claim therefore is unpreserved. The defendant has not presented us with any analysis that would bring the claim within the realm of constitutional protection,[25] and we know of none. See *State* v. *Stepney*, 94 Conn. App. 72, 76–79, 891 A.2d 67, cert. denied, 278 Conn. 911, 899 A.2d 40 (2006). We therefore will not review the claim.

### III

The defendant's last claim is that the court improperly permitted the social worker to testify as to the victim's credibility. This claim is a reprise of the claim of prosecutorial impropriety addressed in part I B 2. As noted previously, the defendant did not object to the prosecutor's questions and did not move to strike Smith's testimony. This is an evidentiary claim that was not preserved at trial, and we therefore will not afford it review.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[25] In his brief, the defendant claims that he was denied the right to confront the witness because he did not know that Smith would be testifying as an expert. First, we agree with the court that Smith did not testify as an expert. Second, the transcript reveals that the court found that the defendant had Smith's report months before trial and chose not to interview her. Third, the transcript also reveals that defense counsel cross-examined and recross-examined Smith.